# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3690-13T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

J.M.,

    Defendant-Appellant.

_____

Argued January 18, 2017 — Decided August 16, 2017

Before Judges Espinosa, Guadagno, and Suter.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 13-01-0091.

Jane M. Personette argued the cause for appellant (Law Offices of Brian J. Neary, attorneys; Mr. Neary, of counsel; Ms. Personette, on the brief).

Suzanne E. Cevasco, Assistant Prosecutor, argued the cause for respondent (Gurbir S. Grewal, Bergen County Prosecutor, attorney; Ms. Cevasco, of counsel and on the brief).

PER CURIAM

Defendant J.M. appeals his convictions and sentence. We affirm.

Defendant is the uncle and godfather of Kimberly.[1]  In 2006, when Kimberly was ten, she would stay overnight at her aunt and defendant's house to play with her cousin Jimmy.  She slept in Jimmy's room when she stayed over, and he slept with his parents.  Kimberly stopped staying overnight after 2006.

In 2013 when Kimberly was seventeen, she revealed to her boyfriend that when she was ten years old, defendant twice touched her inappropriately when she stayed at his house.  She also told her mother, who contacted the local police.

Following investigation, defendant was indicted on two counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b) (counts one and two), and one count of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (count three).  He waived trial by jury, and following a bench trial, was convicted on all counts. Defendant was sentenced to consecutive terms of six years each for the sexual assault charges subject to parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and to a concurrent term of six years on the endangerment charge.  Defendant also was sentenced to parole supervision for life, to comply with

---

[1] We use pseudonyms throughout this opinion to maintain the confidentiality of the minors involved in the case.

Megan's Law requirements,[2] to adhere to a restraining order under Nicole's Law,[3] and to a no-contact order.

At trial, Kimberly testified that when she was in fifth grade and staying at defendant's home for the weekend, she was in bed around midnight but watching television. She heard the door open and closed her eyes to pretend to be asleep as defendant entered the room. He stood over her, breathing heavily, and began touching her breasts and vagina over her clothing. His hands were rough. After he began to touch her, Kimberly rolled over to let defendant know she was awake, and he left. Nothing was said about the incident.

A few weeks later when Kimberly was staying over, she testified defendant again entered her room around midnight, touched her breasts and continued touching her, moving down toward her vagina. She said she wet the bed prior to being touched by defendant and again rolled over to signal to defendant she was awake. After defendant left, she went out to the bathroom and saw defendant walking back to his room. Nothing was said about the incident.

Kimberly did not disclose any of this to her family members at the time. She continued to go places with her aunt and

---

[2] N.J.S.A. 2C:7-1 to -23.

[3] N.J.S.A. 2C:14-12.

A-3690-13T3

defendant, and to visit with Jimmy after this, but did not stay overnight. At her sixteenth birthday party, Kimberly told family and friends in a speech she had written that defendant was "very special" to her and she was "lucky to have him."

When Kimberly was seventeen and she and her boyfriend were "opening up to each other," she texted him about defendant's inappropriate touching. The next day, Kimberly texted her mother about defendant's "touching," "begging" her not to tell anyone, but her mother contacted the police.

Kimberly gave a statement to Detective Linda McNulty of the Bergen County Prosecutor's Office. In her statement, Kimberly alleged defendant touched her under her clothing and that his hand was rough. Detective McNulty looked at and videotaped the text message that Kimberly identified on her phone as pertaining to the allegations against defendant, but did not look at any of her other messages. Kimberly acknowledged the text message to her boyfriend was part of a longer series of texts.

Defendant was questioned by detectives from the Prosecutor's Office. The interview was recorded.[4] The detectives conducted the interview by representing to defendant their belief in the quality and believability of Kimberly's accusations against him.

---

[4] We were not provided the video of the interview, but were provided with the transcript. The video was admitted into evidence at the trial.

During the course of the interview, defendant acknowledged he entered Kimberly's room but only to check on her, and said he did not remember touching her, but that it was "possible." Defendant was shaking his foot throughout the interview, his pulse was visible in his neck and his stomach was growling. At the end, defendant asked to speak with an attorney, the interview terminated, and defendant was arrested.

Defendant was not successful in suppressing the videotape nor reference to his demeanor or body language during the interview. His interview with the detectives was played in its entirety at the bench trial. Kimberly also testified, and her statement to the detectives and the text messages from her to her boyfriend and mother were admitted in evidence at the trial. Dr. Anthony D'Urso, the State's expert, testified at trial about Child Sexual Abuse Accommodation Syndrome (CSAAS) in general, but he was not familiar with the specific facts of this case.

Defendant's witnesses testified about his character for honesty and trustworthiness. Defendant's wife offered testimony that Kimberly might be retaliating for her and defendant's expression to Kimberly that she was too young for a boyfriend. Defendant testified he did not touch Kimberly inappropriately when she slept, responding "[n]o. Absolutely, not" when asked.

On October 13, 2013, the trial judge issued a written "verdict of the court" (verdict). The judge found the State had proven beyond a reasonable doubt that defendant sexually assaulted Kimberly. The "primary issue" was whether the "conduct alleged . . . actually occurred." In that regard, the court found Kimberly's testimony credible based on "several factors," including her demeanor. Her testimony "echoed with the ring of truth." She had no motive to "make false allegations" against defendant. Further, the court found Dr. D'Urso's testimony "persuasive to explain [Kimberly's] failure to confront defendant or address the incidents in a timely fashion." However, the court did not consider this expert testimony as proving one way or the other whether sexual abuse had occurred. The judge "completely discount[ed the detective's] opinion statements regarding [Kimberly's] credibility."

The court gave little weight to defendant's character witnesses. He rejected defendant's wife's testimony that Kimberly continued to sleep over at their house after 2006, finding her testimony "inherently biased." The court found inconsistencies between defendant's trial testimony and his statement to the detectives:

> Defendant's statements at the . . . interview that it was possible he could have put his hands on [Kimberly's] chest by accident, or that the incidents could have happened when

he was drinking, or that he did not recall or remember touching [Kimberly] when he entered the bedroom, are diametrically opposed to his testimony at trial when he unequivocally denied that he touched [Kimberly]. Defendant did not have a clear memory in October 2012, albeit, six years after the alleged incidents. Yet, he definitely testified in October 2013 that he never touched [Kimberly].

The court noted defendant's demeanor at trial and his statement. During the interview he was not "excited, agitated, angry or upset." The court found defendant was "untruthful" when he did not disclose to the detectives that he had other children who lived out of state.

The court concluded "after analyzing all the testimony, considering the credibility of the witnesses and reviewing the evidence" that defendant "touched [Kimberly's] breast/breasts and vagina on two occasions in the fall of 2006." The court found defendant's purpose and intent "was sexually motivated." Also, defendant had "assumed responsibility for [Kimberly's] care when she was in his presence," which supported a finding of second-degree endangering the welfare of a child.

On appeal, defendant raises the following claims:

POINT I

THE COURT BELOW ERRED IN FAILING TO SUPPRESS THE STATEMENT TAKEN FROM DEFENDANT.

POINT II

DEFENDANT'S CONVICTION MUST BE REVERSED BECAUSE, IN RENDERING ITS VERDICT, THE TRIAL COURT IMPERMISSIBLY USED DEFENDANT'S EXERCISE OF HIS RIGHT TO REMAIN SILENT AND RIGHT TO COUNSEL AGAINST HIM.

POINT III

DEFENDANT'S CONVICTION MUST BE REVERSED BASED UPON INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

a. Trial counsel's failure to confront the alleged victim with a material inconsistency between her trial testimony and an earlier statement constituted ineffective assistance of counsel.

b. Trial [c]ounsel's failure to conduct a meaningful cross-examination of the State's expert witness, Dr. Anthony D'Urso, constitutes ineffective assistance of counsel.

c. Trial counsel's failure to conduct a thorough cross-examination of Det. Linda McNulty with respect to her interrogation techniques and the impact upon [d]efendant's demeanor during the police interrogation constitute ineffective assistance of counsel.
POINT IV

SPOLIATION OF EVIDENCE REQUIRES THAT DEFENDANT'S CONVICTION BE REVERSED.

POINT V

CUMULATIVE TRIAL ERRORS IN THE CONTEXT OF THE PROCEEDINGS BELOW DEPRIVED DEFENDANT OF A FAIR TRIAL AND WARRANT REVERSAL.

POINT VI

THE SENTENCE IMPOSED BY THE COURT BELOW IS EXCESSIVE.

a. The [c]ourt below erred in its analysis of aggravating and mitigating factors.

b. Concurrent sentences should have been imposed.

c. The [c]ourt below erred in failing to sentence [d]efendant as if convicted of offenses one degree lower. (not argued below)

## II.

### A.

Defendant contends the trial court erred in denying his motion to suppress the statement he gave when he was interviewed by the detectives. On appeal, he contends that the "aggressive interrogation" and references by the detectives to Kimberly's veracity and defendant's guilt "so permeated and tainted the interview process that the questions cannot be separated from the responses, verbal and non-verbal."

In admitting the statement in its entirely, the trial court found the statement was "knowingly and voluntarily taken." We agree with the trial court. Defendant was read his <u>Miranda</u>[5] rights and he initialed the <u>Miranda</u> card. He never asked that questioning cease and when he did ask for a lawyer, the interview stopped.

Defendant takes issue with the "aggressive interrogation." However, "[u]se of psychological tactics is not prohibited." <u>State</u>

---

[5] <u>Miranda v. Arizona</u>, 384 <u>U.S.</u> 436, 86 <u>S. Ct.</u> 1602, 16 <u>L. Ed.</u> 2d 694 (1966).

v. Faucette, 439 N.J. Super. 241, 260 (App. Div. 2015) (citation omitted). "Unlike the use of physical coercion, . . . use of a psychologically-oriented technique during questioning is not inherently coercive." Ibid. (alteration in original) (quoting State v. Galloway, 133 N.J. 631, 654 (1993)).

There was nothing coercive about the interview. It was short in duration; there were no threats; defendant was provided with some food; there was no physical force; and the interview was terminated when he requested an attorney. "A voluntary intelligent statement by a defendant fully informed of his rights is admissible." Id. at 264.

Defendant also challenges the denial of his suppression motion because during the interview the detectives expressed their views about Kimberly's veracity and defendant's guilt.

It is improper for a police officer to testify to a jury regarding his opinion of a defendant's guilt or credibility. See State v. Frisby, 174 N.J. 583, 593-94 (2002); see also State v. Landeros, 20 N.J. 69, 74-75 (1955) (finding that a police captain's testimony to a jury about defendant's guilt warranted reversal of the conviction). In denying the suppression motion, the trial court found there was "prejudice in the way the questions [were] phrased." However, the court stated that it made no "inference against the defendant because of the tactics and the opinions used

A-3690-13T3

by the detective," and indicated the detective's tactics were "ripe for cross-examination."

Moreover, the court expressed "I have no doubt I can ignore the opinions given by the detectives . . . as to guilt or innocence," and that whether defendant's nervous demeanor was because "he's really nervous, or because he's prevaricating" was for the court to decide as the trier of fact at the bench trial.

Defendant cites no authority to suppress the statement based on his unsupported concern the judge would be compromised in deciding the case because of the detectives' expressions in the interview. The judge made a conscious decision here to disregard the opinions of the detectives. The record reflects no waver in this resolve.

### B.

The court's verdict contrasted defendant's demeanor at trial, where he testified he was "shocked" and "floored" by the allegations, with his demeanor in the interview, where he "made no protestations or expressions of 'shock,' nor did he make any statements indicative of disbelief." When defendant was asked by the detectives in the interview if Kimberly were lying, the court observed "defendant did not respond 'Yes, she is lying,' but instead replied: 'I need to see a lawyer.'" Defendant seeks a reversal of his conviction claiming the trial court

"impermissibly" used his exercise of the right to counsel and the right to remain silent against him.

"[T]he right of . . . a suspect to remain silent when in police custody or under interrogation has always been a fundamental aspect of the privilege [against self-incrimination] in this state." State v. Muhammad, 182 N.J. 551, 567 (2005) (alterations in original) (quoting State v. Deatore, 70 N.J. 100, 114 (1976)). "Making reference at trial to what a defendant did not say to the police is commenting on his silence." Id. at 565 (citations omitted). Also, "a suspect who initially responds to police questioning may later assert his right to remain silent without fear that his silence will be used to incriminate him at trial." Id. at 567-68.

The right to counsel is "an adjunct of the privilege against self-incrimination." State v. Reed, 133 N.J. 237, 253 (1993). In the "pre-indictment stage of a prosecution . . . the 'essential purpose' of the right to counsel in the context of custodial interrogation 'is to prevent compelled self-incrimination.'" Id. at 252 (quoting State v. Sanchez, 129 N.J. 261, 266 (1992)). The right requires that interrogation cease upon the suspect's invocation of the right. Id. at 253.

Here, defendant waived his right to remain silent when, following the administration of his Miranda rights, he voluntarily

spoke with the detectives in a video-recorded interview. "When a defendant agrees to give a statement, he or she has not remained silent, but has spoken." State v. Tucker, 190 N.J. 183, 189 (2007). "[I]t is not an infringement of a defendant's right to remain silent for the State to point out differences in the defendant's testimony at trial and his or her statements that were freely given." Ibid. (citations omitted). However, "the use of such evidence [is limited] to issues of credibility and not substantive evidence on the issue of defendant's guilt or innocence." Id. at 191 (citation omitted). The judge's findings pointed out these inconsistencies. The inconsistencies and defendant's demeanor on the videotape were all part of what the court used in evaluating defendant's credibility.

The State concedes that the court "improperly" commented on defendant's exercise of his right to counsel, and we agree. However, the court's verdict was clearly based on its credibility assessment of Kimberly, the "inconsistencies" between defendant's trial testimony and statements he made to the detectives and his demeanor and not on defendant's invocation of his right to speak with counsel. The error was not plain error. R. 2:10-2.

C.

Defendant raises that his trial counsel provided ineffective assistance by failing to cross-examine Kimberly about

inconsistencies between her statement to the police and her testimony at trial, by not conducting a meaningful cross-examination of Dr. D'Urso and by not thoroughly examining Detective McNulty about her interview techniques and their impact on defendant's demeanor.

There exists "a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record." State v. Preciose, 129 N.J. 451, 460 (1992) (citations omitted). We decline to address the issues here.

D.

Defendant contends the trial suffered from "cumulative errors" that deprived him of a fair trial. See State v. Simms, 224 N.J. 393, 407 (2016) (reversing conviction based on the "cumulative effect of the errors"). This claim warrants only brief comment. R. 2:11-3(e)(2). As for the claim that other text messages on Kimberly's phone were not preserved by the detectives, defendant did not allege the requisite "bad faith" by the detectives in not preserving them. See State v. Hollander, 201 N.J. Super. 453, 479 (App. Div.) (citations omitted) (focusing on three factors to determine whether a due process violation occurred by the loss of physical evidence, including "whether there was bad faith or connivance on the part of the government"), certif.

denied, 101 N.J. 335 (1985). As for the claim of cumulative errors, "the theory of cumulative error [does] not apply where no error was prejudicial and the trial was fair." State v. Weaver, 219 N.J. 131, 155 (2014) (citation omitted). Defendant did not show any prejudicial error.

E.

We reject defendant's claim that the judge erred in imposing consecutive sentences and in balancing the aggravating and mitigating factors.[6]

We review a judge's sentencing decision under an abuse of discretion standard. State v. Fuentes, 217 N.J. 57, 70 (2014). We must determine whether:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (alterations in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

"A judge's sentencing analysis is a fact-sensitive inquiry, which must be based on consideration of all the competent and credible

---

[6] Reference is to N.J.S.A. 2C:44-1(a) and (b).

evidence raised by the parties at sentencing." State v. Jaffe, 220 N.J. 114, 116 (2014).

Defendant contends the trial court erred by finding that aggravating factor three applied and also by not finding that mitigating factors eight, nine and ten applied. N.J.S.A. 2C:44-1(a)(3); N.J.S.A. 2C:44-1(b)(8)-(10).

In sentencing defendant, the court found that aggravating factors two, three and nine applied. The court gave significant weight to factor two, the seriousness of the harm, noting that Kimberly did not reveal the assaults because she was trying to keep her family together and that she also suffered "severe emotional trauma" from her silence. The court gave minimal weight to factor three, the risk of re-offense, noting that although defendant maintained his innocence, there was a risk he would reoffend. The court gave substantial weight to factor nine, the need to deter, finding there was a great need to deter individuals from committing sex offenses. The court found that aggravating factor four, breach of trust, applied to counts one and two, giving that factor substantial weight.

In applying the mitigating factors, the court gave significant weight to factor seven, as defendant had no criminal history and several members of the community had written supportive letters. The court gave minimal weight to factor eleven, finding

there was always a hardship to a family when one member becomes incarcerated. The court found the aggravating factors substantially outweighed the mitigating factors, and sentenced defendant accordingly.

We have no quarrel with the court's analysis. There was evidence that defendant was not forthcoming even with the character witnesses who testified for him because none were aware defendant was the father of three other children from a prior relationship. The court highlighted inconsistencies in defendant's testimony and in his demeanor. The incidents were not disclosed. We cannot say, therefore, that the judge erred by finding a risk of re-offense, even though defendant maintained his innocence, based on defendant's behavior and the judge's assessment of his credibility. These bases also support the non-applicability of the mitigating factors now advanced by defendant such as number eight (circumstances unlikely to recur), number nine (unlikely to commit another offense) and number ten (will respond favorably to probationary treatment). See N.J.S.A. 2C:44-1(b)(8)-(10).

There was nothing shocking about the sentence given the offense, where the victim was ten and defendant is her uncle. There was no compelling reason to downgrade the sentence because the mitigating circumstances did not outweigh the aggravating ones. See N.J.S.A. 2C:44-1(f)(2).

17                                              A-3690-13T3

Defendant contends that the court should have imposed concurrent rather than consecutive sentences for the sexual assault offenses. However, the trial court properly considered and applied the relevant factors under State v. Yarbough, 100 N.J. 627, 643-44 (1985), cert. denied, 475 U.S. 1014, 106 S. Ct. 1193, 89 L. Ed. 2d 308 (1986). The court noted that the crimes were committed "independent of each other; that they . . . were separate acts occurring at least twice, separate[d by] at least two weeks apart . . . [and] they were committed at different times or different places." We agree with the court's application and analysis of the Yarbough factors and with defendant's sentence to consecutive terms.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3690-13T3